H.H. (SHASHI) KEWALRAMANI
S|H|K Legal, APC
2603 Main Street, Suite 350
Irvine, CA 92614
Telephone: (714) 335-4590
Fax: (714) 602-9290
Email: shashi@shklegal.com

JONATHAN T. SUDER (*Pro Hac Vice To Be Filed)*
BRETT M. PINKUS (*Pro Hac Vice To Be Filed)*
RICHARD A. WOJCIO, JR. (*Pro Hac Vice To Be Filed)*
FRIEDMAN, SUDER & COOKE
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
Telephone: (817) 334-0400
Facsimile: (817) 334-0401
Email: jts@fsclaw.com
Email: pinkus@fsclaw.com
Email: wojcio@fsclaw.com

Attorneys for Plaintiff
COMMERCIAL COPY INNOVATIONS, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA,**

**SOUTHERN DIVISION**

| | |
|---|---|
| COMMERCIAL COPY INNOVATIONS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>RICOH ELECTRONICS, INC.,<br><br>RICOH USA, INC.,<br><br>MIMAKI USA, INC., and<br><br>LANIER WORLDWIDE, INC.,<br><br>Defendants. | CASE NO. 8:17-437<br><br>**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff COMMERCIAL COPY INNOVATIONS, INC. files this Original Complaint against Defendants RICOH ELECTRONICS, INC., RICOH USA, INC., MIMAKI USA, INC., and LANIER WORLDWIDE, INC. alleging as follows:

## I. THE PARTIES

1. COMMERCIAL COPY INNOVATIONS, INC. ("Plaintiff" or "CCI") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 600 Anton Boulevard, Suite 1350, Costa Mesa, California 92626, within the Central District of California.

2. Defendant RICOH ELECTRONICS, INC. ("REI") is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business at 1100 Valencia Avenue, Tustin, California 92789, within the Central District of California. REI may be served with process by serving CT Corporation System at 818 W. 7th Street, Suite 930, Los Angeles, California 90017.

3. Defendant RICOH USA, INC. ("RUSA") is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business at 70 Valley Stream Parkway, Malvern, Pennsylvania. RUSA may be served with process by serving CT Corporation System at 818 W. 7th Street, Suite 930, Los Angeles, California 90017.

4. Defendant LANIER WORLDWIDE, INC. ("Lanier") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 2300 Parklake Drive, NE, Atlanta, Georgia 30345. Lanier may be served with process by serving CT Corporation System at 818 W. 7th Street, Suite 930, Los Angeles, California 90017, within this district.

5. Defendant MIMAKI USA, INC. ("Mimaki") is a corporation organized and existing under the laws of the State of Georgia, with a principal place of business in 150 Satellite Boulevard NE, Suwanee, Georgia 30024. Mimaki may be served with process by serving National Registered Agents, Inc. at 818 W. 7th Street, Suite 930, Los Angeles, California 90017, within this district.

## II. JURISDICTION AND VENUE

6. This is an action for infringement of several United States patents. Federal question jurisdiction is conferred to this Court over such action under 28 U.S.C. §§ 1331 and 1338(a).

7. Upon information and belief, Defendants had sufficient minimum contacts with the Central District of California, Southern Division such that this venue is fair and reasonable. Defendants have committed such purposeful acts and/or transactions in this District that they reasonably should know and expect that they could be hailed into this Court as a consequence of such activity. Defendants have transacted and, at the time of the filing of this Complaint, are transacting business within the Central District of California.

8. Further, upon information and belief, Defendants manufacture, assemble, or sell products that are and have been used, offered for sale, sold, and/or purchased in the Central District of California, Southern Division. Defendants directly and/or through their distribution network, places infringing products or systems within the stream of commerce, which stream is directed at this district, with the knowledge and/or understanding that those products will be sold and/or used in the Central District of California, Southern Division.

9. For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b).

## III. BACKGROUND AND FACTS

10. CCI has acquired all rights and title in and to U.S. Patents Nos. 6,848,777 ("the '777 Patent"), 6,773,102 ("the '102 Patent"), 6,197,466 ("the '466 Patent"), and 6,453,127 ("the '127 Patent") from the Eastman Kodak Company ("Kodak") for the purpose of enforcing the rights embodied therein. These patents are sometimes referred to collectively, hereinafter, as "the Asserted Patents" and each was developed by Kodak as part of Kodak's research and development activities performed in furtherance of Kodak's design, manufacture, and selling of printers and printing accessories and devices.

11. Kodak is a world-renowned U.S.-based company, founded in 1888, which has been an industry leader in the design and manufacture of cameras and film, digital imaging

devices, printers, ink, toner, and related devices. Over the nearly 130 years that Kodak has been in business, Kodak has developed many valuable innovations in the photographic, imaging, and printing industries which led to the issuance of thousands of patents, including the Asserted Patents. Many of these innovations were directly developed by engineers and scientists working at Kodak Research Laboratories as part of Kodak's continuous work to advance photography, imaging, and printing technology.

12. REI is a wholly owned subsidiary of Ricoh Company, Ltd. which is one of the largest manufactures of office equipment including printers, ink, and toner, among other products in the world. REI's principal place of business is a manufacturing plant in Tustin, California, within this district. REI manufactures products and systems that support the enhancement of office productivity, including printers, copiers, servers, inkjet heads, inkjet ink, and toner.

13. REI manufactures the Pro L4130 and 4160 model production printers advertised to enable production of "brilliant signs, banners, wraps, point-of-sale displays and more with real-life reproduction quality across today's most innovative substrates" which include, among others, PET, Tarpaulin, PVC, and window film. REI manufactures the L4160 Ink Packs for use with the Pro L4130 and 4160 model printers, which are described as being "water-based inks" and configured for printing "on almost any substrate, including plastic, vinyl, textile, clear film, backlit materials and more." As such, these printer and ink products are specially configured for use to print on media comprising non-absorbing substrates. Upon information and belief, the L4160 Ink Packs comprise diethylene glycol derivative, alcohol derivative, pigment, resin, amine, and water. Further, L4160 Ink Packs are believed to comprise a polymer binder containing less than 25% of hydrophilic monomer by polymer weight and which is dispersible but not insoluble in aqueous media.

14. Upon information and belief, REI manufactures the PxP-EQ Toner, which comprises toner particles mixed with the metal oxides, such as titanium dioxide and silicon dioxide, which are embedded below the surface of the toner particles, with the total metal oxide content of the PxP-EQ toner falling between 0.1 – 5.0% by weight.

15. Upon information and belief, REI also manufactures printer, copier, ink, and toner products under the Savin brand name, including the MP7100 printers and Color LP Toner Cassettes. The MP7100 printers accommodate access by remote users to remotely configure and monitor the printer via a web browser via downloadable software. The Color LP Toner comprises toner particles mixed with the metal oxides, such as titanium dioxide and silicon dioxide, which are embedded below the surface of the toner particles, with the total metal oxide content of between 0.1 – 5.0% by weight. Savin branded products are sold throughout the United States by via direct sales to consumers, through dealers, and online at URL: http://www.savin.com, a website operated by RUSA.

16. Lanier makes and sells commercial office equipment including copiers, fax machines, scanners, and printers, as well as parts, supplies, and software solutions therefor, including the 4800038 Black Toner and the MP 402SPF, the SP 5300DN, the MP 501SPF, and the MP 601SPF series copier/printer devices. The 4800038 Black Toner comprises toner particles mixed with the metal oxides, such as titanium dioxide and silicon dioxide, which are embedded below the surface of the toner particles, with the total metal oxide content of between 0.1 – 5.0% by weight. The MP 402SPF, the SP 5300DN, the MP 501SPF, and the MP 601SPF series copier/printer devices accommodate access by remote users to remotely configure and monitor the printer via a web browser via downloadable software. Ricoh Company, Ltd. acquired Lanier in 2001 and now operates Lanier as a wholly owned subsidiary of Ricoh Company, Ltd. Lanier products are sold throughout the United States by via direct sales to consumers, through dealers, and online at URL: http://www.lanier.com, a website operated by RUSA.

17. RUSA is a wholly owned subsidiary of Ricoh Company, Ltd. Ricoh products, including those manufactured by REI, are sold throughout the United States by RUSA via direct sales to consumers, through dealers, and online at URL: http://www.ricoh-usa.com.

18. The Ricoh, Lanier, and Savin product brands, among others comprise the Ricoh Family Group ("RFG"). The RFG products are largely identical but are sold through different distribution channels. Upon information and belief, the printer products, inks, and toners

manufactured under the respective RFG brands comprise similar or identical components, features, and functions. Specifically, upon information and belief, the printer products and accessories manufactured by RFG entities are compatible with ink or toner of similar or identical compositions, such as the L4160 Ink Packs, PxP-EQ toner, and the Color LP Toners, among others. Further, upon information and belief, the printer products and accessories manufactured by RFG entities comprise similar software and hardware based functionality. These components, features, and functions at least partially comprise the subject matter of the Asserted Patents at issue in this suit.

19. Mimaki is the United States arm of Mimaki Engineering Company, Ltd. Upon information and belief, Mimaki manufactures and sells Mimaki printers and accessories, including ink and toner throughout the United States.

20. Mimaki manufactures the JV400-130LX and JV400-160LX printers which are specially configured for printing on non-absorbing media and use "water-based latex inks" such as Mimaki's LX101 latex inks. Upon information and belief, the LX101 latex inks comprise diethylene glycol derivative, alcohol derivative, pigment, resin, amine, and water. Further, analysis of Mimaki's LX101 latex inks indicate they comprise a polymer binder containing less than 25% of hydrophilic monomer by polymer weight and which is dispersible but not insoluble in aqueous media.

21. Upon information and belief, RUSA has a supplier-reseller relationship with Mimaki whereby certain Mimaki printers are implemented with the Ricoh Gen5 printheads and print engines. RUSA is a reseller of certain Mimaki printers in the United States, including the Mimaki JFX200 and JFX500 printers. Further, upon information and belief, Ricoh and Mimaki inks comprise identical compositions which are branded and sold under the Ricoh and Mimaki names, respectively. Certain Mimaki and Ricoh printers, therefore, are compatible with the inks sold under either the Mimaki or Ricoh brand names. For example the Mimaki JV400LX and Ricoh L4130/L4160 printers, among others, which use the same Gen 5 Ricoh printheads and the same print engines, are compatible with both the L4160 AR and LX-101 inks.

22. It is proper to join all named Defendants in this suit because RIE, RUSA, and Lanier are commonly owned entities forming a portion of the RFG, making and selling similar or identical printing products, inks, and toners which form the bases of each entities' infringing actions. Mimaki makes and sells similar or identical printing products, inks, and toners to those of certain RFG products, forming the basis of Mimaki's infringing conduct. Mimaki printers and inks are suitable for use with Ricoh products and inks, including those manufactured by REI and sold by RUSA.

## III. PATENT INFRINGEMENT

### U.S. Patent No. 6,773,102 B2

23. CCI repeats and realleges all preceding paragraphs of this Complaint, as though fully set forth herein.

24. On August 10, 2004, United States Patent No. 6,773,102 B2 ("the '102 Patent") was duly and legally issued for an "Inkjet Printing Method for an Ink/Receiver Combination." As of the filing of this Complaint the '102 Patent remains in force. A true and correct copy of the '102 Patent is attached hereto as Exhibit "A" and made a part hereof.

25. CCI is the owner of all right and title in the '102 Patent, including all rights to enforce and prosecute action for infringement of the '102 Patent and to collect damages for all relevant times against infringers of the '102 Patent. Accordingly, CCI possesses the exclusive right and standing to prosecute the present action for infringement of the '102 Patent by Defendants.

26. The '102 Patent generally discloses and claims printing methods employing aqueous, or water-based, ink jet ink for printing onto media comprising non-absorbing substrates, such as untreated vinyl, for example, or other essentially non-porous materials. The aqueous ink jet ink composition comprises a pigment, a polymer binder dispersible but insoluble in aqueous media and comprising less than 25% hydrophilic monomer by weight, a surfactant, and a humectant. The aqueous ink jet ink may be used by a suitable printer configured for printing on media comprising a non-absorbing substrate and employing a heating step.

27. Upon information and belief, REI and RUSA had knowledge of, or were willfully blind to, the existence of the ‘102 Patent since well before the filing of this Complaint. Ricoh Co., Ltd., the parent company owning both REI and RUSA has nearly 50,000 patents as of March, 2016 and is, therefore, well apprised of the state of the art within the printing industry, in which Ricoh Co. Ltd. is an industry leader. Upon information and belief, REI and RUSA acquired knowledge of the ‘102 Patent through prosecution of the many patent applications worldwide of its parent company and/or through benchmarking activities undertaken by REI investigating competitor’s products, such as those of Kodak.

28. Additionally, or alternatively, REI and RUSA have had actual knowledge of the existence of the ‘102 Patent since at least March 10, 2017, the date which Ricoh received a copy of the ‘102 Patent attached to correspondence from CCI alleging infringement of one or more claims of the ‘102 Patent consistent with the allegations made herein.

29. REI, without authority, consent, right, or license, and in direct infringement of the ‘102 Patent, manufacture, have manufactured, make, have made, use, import, or have imported systems or products that practice the method claimed in one or more claims of the ‘102 Patent. By way of example only, REI’s quality testing and demonstrations of operation of the Pro L4130 and Pro L4160 model production printers using the L4160 Pro AR Ink Packs to print on various media comprising non-absorbing substrates directly infringe at least Claim 1 of the ‘102 Patent.

30. REI also actively induces infringement of one or more of the claims of the ‘102 Patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). REI makes the Pro L4130 and Pro L4160 model production printers and the L4160 Pro AR Ink Packs. Use of the L4160 Pro AR Ink Packs in production printers, such as the Pro L4130 and Pro L4160 model production printers, to print on media comprising a non-absorbing substrate infringes at least Claim 1 of the ‘102 Patent. REI manufactures these products knowing that they are especially designed for and marketed toward such infringing use by users of these products, such as by commercial print shops, for example, for use in printing banners, signs, and other printed products on media comprising non-absorbing substrates. Further, upon information and belief, REI provides instructions for use of these

products to infringe the ‘102 Patent in the form of user manuals packaged with REI’s printers and/or inks.

31. RUSA, without authority, consent, right, or license, and in direct infringement of the ‘102 Patent, markets, sells, sold, or offers for sale systems or products that practice the method claimed in one or more claims of the ‘102 Patent. By way of example only, RUSA’s demonstrations of operation of the Pro L4130 and Pro L4160 model production printers using the L4160 Pro AR Ink Packs to print on various media comprising non-absorbing substrates directly infringe at least Claim 1 of the ‘102 Patent.

32. RUSA actively induces infringement of one or more of the claims of the ‘102 Patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). RUSA sells the Pro L4130 and Pro L4160 model production printers and the L4160 Pro AR Ink Packs to customers, such as commercial print shops, for example, for use in printing banners, signs, and other printed products on media comprising non-absorbing substrates. Upon information and belief, RUSA’s customers use at least the L4160 Pro AR Ink Packs in production printers, such as the Pro L4130 and Pro L4160 model production printers, for example, to print on media comprising a non-absorbing substrate in the manner claimed in at least Claim 1 of the ‘102 Patent. RUSA markets the Pro L4130 and 4160 model production printers it manufactures and sells as being configured for use in printing signs, banners, and the like, on media comprising any of several non-absorbing substrates. Additionally, RUSA markets the L4160 Pro AR Ink Packs it manufactures and sells as being an aqueous ink usable with the Pro L4130/4160 printers for printing on media comprising a non-absorbent substrate. Upon information and belief, RUSA provides information to its customers in the form of brochures, manuals, online content, and via live demonstrations at industry conferences and exhibitions instructing them to use the RUSA products in a manner which infringes at least claim 1 of the ‘102 Patent.

33. REI contributes to the infringement of one or more of the claims of the ‘102 patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). REI makes at least the L4160 AR Ink Packs

which comprise aqueous ink jet inks for use in combination with a suitably configured printer to print on media comprising non-absorbing substrates. The L4160 AR Ink Packs are especially designed for use in this manner, printing on non-absorbing substrates, such that the L4160 Ink Packs comprise a material part of the invention claimed in at least claim 1 of the '102 Patent. Further, upon information and belief, the L4160 AR Inks have no substantial non-infringing use, as they are specifically designed for use for printing on non-absorbing substrates. Use by REI's customers of the L4160 AR Ink Packs in the manner advertised by REI constitutes direct infringement of at least claim 1 of the '102 Patent.

34. RUSA contributes to the infringement of one or more of the claims of the '102 patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). RUSA sells at least the L4160 AR Ink Packs which comprise aqueous ink jet inks and are marketed as being ideal for a wide range of uses, from posters and point of purchase to window applications and outdoor banners. The L4160 AR Ink Packs of RUSA are especially suited for use in a manner that infringes at least claim 1 of the '102 Patent and comprise a material part of the invention claimed in at least claim 1 of the '102 Patent. Further, upon information and belief, the L4160 AR Inks have no substantial non-infringing use, as they are specifically designed for use for printing on non-absorbing substrates. Use by RUSA's customers of the L4160 AR Ink Packs in the manner advertised by RUSA constitutes direct infringement of at least claim 1 of the '102 Patent.

35. CCI expressly reserves the right to assert additional claims of the '102 against REI and RUSA.

36. CCI has been damaged as a result of REI's infringing conduct as well as RUSA's infringing conduct. REI and RUSA are, thus, liable to CCI in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

37. Based on REI's and RUSA's objective recklessness, CCI is further entitled to enhanced damages under 35 U.S.C. § 284.

38. Upon information and belief, Mimaki had knowledge of, or was willfully blind to, the existence of the ‘102 Patent since well before the filing of this Complaint. Mimaki is a direct competitor of Kodak in the printing industry and has a large patent portfolio of its own, with approximately 350 U.S. patents and patent application filings. Mimaki is well apprised of the state of the art within the printing industry. Upon information and belief, Mimaki acquired knowledge of the ‘102 Patent through prosecution of one or more of its many patent applications and/or through benchmarking or other engineering activities undertaken by Mimaki to investigate the products of KODAK, a direct competitor of Mimaki’s in the printing industry.

39. Additionally, or alternatively, Mimaki has actual knowledge of the existence of the ‘102 Patent since at least March 13, 2017, the date which Mimaki received a copy of the ‘102 Patent attached to correspondence from CCI alleging infringement of one or more claims of the ‘102 Patent consistent with the allegations made herein.

40. Mimaki, without authority, consent, right, or license, and in direct infringement of the ‘102 Patent, manufacture, have manufactured, make, have made, use, import, have imported, market, sell, or offer for sale systems or products that directly infringe one or more claims of the ‘102 Patent. By way of example only, Mimaki’s quality testing and demonstrations of operation of the of the JV400-130LX and JV400-160LX printers used with aqueous ink jet inks, such as Mimaki’s LX101 inks to print on media comprising a non-absorbing substrate directly infringe at least Claim 1 of the ‘102 Patent.

41. Mimaki actively induces infringement of one or more claims of the ‘102 Patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). Mimaki makes and sells the LX101 aqueous latex inks as well as the JV400-130LX and JV400-160LX printers to customers, such as commercial print shops, for example, which are marketed for use in printing signs, banners, posters, window clings, among other applications. Upon information and belief, these applications involve printing on media comprising a non-absorbing substrate. As such, customers of Mimaki use the LX101 inks with the JV400-130LX or 160LX printers to practice the method claimed in at least claim 1 of the ‘102 Patent. Mimaki markets the LX101 ink as being an aqueous ink usable to

print on PVC film, banner materials, and other media comprising non-absorbing substrates. Additionally, Mimaki markets the JV400 Series printers as being compatible with the LX101 inks. Upon information and belief, Mimaki provides information to its customers in the form of brochures, manuals, online content, and via demonstrations instructing them on how to use at least the identified Mimaki products in a manner which directly infringes at least claim 1 of the '102 Patent.

42. Mimaki contributes to infringement of one or more of the claims of the '102 patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. §271(c). Mimaki makes and sells at least the LX101 ink jet inks which comprise aqueous ink jet inks and are marketed as being usable to print on PVC film, banner materials, and other media comprising non-absorbing substrates. As such, the LX101 inks are especially adapted for use in a manner that infringes at least claim 1 of the '102 Patent and comprise a material component of the combination claimed. Use of the LX101 inks by Mimaki's customers in accordance with Mimaki's product literature and marketing materials constitutes direct infringement of at least claim 1 of the '102 Patent. Upon information and belief, the LX101 inks of Mimaki have no substantial non-infringing use as they are specially configured for printing on non-absorbing substrates.

43. CCI expressly reserves the right to assert additional claims of the '102 against Mimaki.

44. CCI has been damaged as a result of Mimaki's infringing conduct. Mimaki is, thus, liable to CCI in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Based on Mimaki's objective recklessness, CCI is further entitled to enhanced damages under 35 U.S.C. § 284.

## IV. PATENT INFRINGEMENT

### U.S. Patent No. 6,848,777 B2

45. CCI repeats and realleges all preceding paragraphs of this Complaint, as though fully set forth herein.

46. On February 1, 2005, United States Patent No. 6,848,777 B2 ("the ''777 Patent") was duly and legally issued for an "Aqueous Inkjet Ink and Receiver Combination." As of the filing of this Complaint the '777 Patent remains in force. A true and correct copy of the '777 Patent is attached hereto as Exhibit "B" and made a part hereof.

47. CCI is the owner of all right and title in the '777 Patent, including all rights to enforce and prosecute action for infringement of the '777 Patent and to collect damages for all relevant times against infringers of the '777 Patent. Accordingly, CCI possesses the exclusive right and standing to prosecute the present action for infringement of the '777 Patent by Defendants.

48. The '777 Patent generally discloses and claims aqueous ink jet ink suitable for printing onto receiving media comprising non-absorbing substrates, such as untreated vinyl, for example, or other essentially non-porous materials. The aqueous ink jet ink composition comprises a pigment, a polymer binder dispersible but insoluble in aqueous media and comprising less than 25% hydrophilic monomer by weight, a surfactant, and a humectant.

49. For at least the reasons stated above, in reference to the '102 Patent of CCI, REI and RUSA likely had prior knowledge of, or were willfully blind to, the existence of the '777 Patent since well before the filing of this Complaint.

50. Additionally, or alternatively, REI and RUSA have actual knowledge of the existence of the '777 Patent since at least March 10, 2017, the date which REI and RUSA, respectively, received copies of the '777 Patent attached to correspondence from CCI alleging infringement of one or more claims of the '777 Patent consistent with the allegations made herein.

51. REI, without authority, consent, right, or license, and in direct infringement of the '777 Patent, manufacture, have manufactured, make, have made, use, import, or have imported systems or products infringing one or more claims of the '777 Patent. By way of example only, REI's making and using the L4160 Pro AR Ink Packs for printing on various media comprising non-absorbing substrates directly infringe at least Claim 1 of the '777 Patent.

52. RUSA, without authority, consent, right, or license, and in direct infringement of the ‘777 Patent market, sell, or offer for sale systems or products infringing one or more claims of the ‘777 Patent. By way of example only, RUSA’s selling and using the L4160 Pro AR Ink Packs for printing on various media comprising non-absorbing substrates directly infringe at least Claim 1 of the ‘777 Patent.

53. REI actively induces infringement of one or more of the claims of the ‘777 Patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). REI makes the L4160 Pro AR Ink Packs knowing that they are sold to customers, such as commercial print shops, for example, and marketed as being configured for use in printing banners, signs, and other printed products on media comprising non-absorbing substrates. Upon information and belief, REI’s customers use at least the L4160 Pro AR Ink Packs in production printers, such as the Pro L4130 and Pro L4160 model production printers, for example, to print on media comprising a non-absorbing substrate. Further, upon information and belief, REI provides instructions for use of these products to infringe the ‘777 Patent in the form of user manuals packaged with REI’s printers and/or inks.

54. RUSA actively induces infringement of one or more of the claims of the ‘777 Patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). RUSA sells the L4160 Pro AR Ink Packs to customers, such as commercial print shops, for example, for use in printing banners, signs, and other printed products on media comprising non-absorbing substrates. Upon information and belief, RUSA’s customers use at least the L4160 Pro AR Ink Packs in production printers, such as the Pro L4130 and Pro L4160 model production printers, for example, to print on media comprising a non-absorbing substrate. The Pro L4130 and 4160 model production printers as marketed as being configured for use with the L4160 Pro AR Ink Packs to print signs, banners, and the like, on media comprising any of several non-absorbing substrates. Upon information and belief, REI and/or RUSA provides information to its customers in the form of brochures, manuals, online content, and via live demonstrations at industry conferences and exhibitions

instructing them to use the L4160 Pro AR Ink Packs products with media comprising a non-absorbing substrate in a manner which directly infringes at least claim 1 of the '777 Patent.

55. REI contributes to the infringement of one or more of the claims of the '777 patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). REI makes at least the L4160 AR Ink Packs which comprise aqueous ink jet ink and are marketed as being ideal for a wide range of uses, from posters and point of purchase to window applications and outdoor banners. The L4160 AR Ink Packs are intended to be used in combination with a suitably configured printer to print on media comprising non-absorbing substrates. The L4160 AR Ink Packs are especially designed for use in this manner, printing on non-absorbing substrates, such that the L4160 Ink Packs comprise a material part of the invention claimed in at least claim 1 of the '777 Patent. Further, upon information and belief, the L4160 AR Inks have no substantial non-infringing use, as they are specifically designed for use for printing on non-absorbing substrates. Use by REI's customers of the L4160 AR Ink Packs in the manner advertised by REI constitutes direct infringement of at least claim 1 of the '777 Patent.

56. RUSA contributes to the infringement of one or more of the claims of the '777 patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). RUSA sells at least the L4160 AR Ink Packs which comprise aqueous ink jet inks and are marketed as being ideal for a wide range of uses, from posters and point of purchase to window applications and outdoor banners. The L4160 AR Ink Packs are intended to be used in combination with a suitably configured printer to print on media comprising non-absorbing substrates. The L4160 AR Ink Packs are especially designed for use in this manner, printing on non-absorbing substrates, such that the L4160 Ink Packs comprise a material part of the invention claimed in at least claim 1 of the '777 Patent. Further, upon information and belief, the L4160 AR Inks have no substantial non-infringing use, as they are specifically designed for use for printing on non-absorbing substrates. Use by REI's customers of the L4160 AR Ink Packs in the manner advertised by REI constitutes direct infringement of at least claim 1 of the '777 Patent.

57. CCI expressly reserves the right to assert additional claims of the ‘777 Patent against REI and RUSA, respectively.

58. CCI has been damaged as a result of REI’s and RUSA’s infringing conduct. REI an RUSA are, thus, liable to CCI in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

59. Based on REI’s and RUSA’s respective objective recklessness, CCI is further entitled to enhanced damages under 35 U.S.C. § 284.

60. For at least the reasons stated above, in reference to the ‘102 Patent of CCI, Mimaki likely had prior knowledge of, or was willfully blind to, the existence of the ‘777 Patent since well before the filing of this Complaint.

61. Additionally, or alternatively, Mimaki has actual knowledge of the existence of the ‘777 Patent since at least March 13, 2017, the date which Mimaki received a copy of the ‘777 Patent attached to correspondence from CCI alleging infringement of one or more claims of the ‘777 Patent consistent with the allegations made herein.

62. Mimaki, without authority, consent, right, or license, and in direct infringement of the ‘777 Patent, manufacture, have manufactured, make, have made, use, import, have imported, market, sell, or offer for sale systems or products infringing one or more claims of the ‘777 Patent. By way of example only, Mimaki’s making, selling, and using the LX101 series inks for printing on various media comprising non-absorbing substrates directly infringe at least Claim 1 of the ‘777 Patent.

63. Mimaki actively induces infringement of one or more of the claims of the ‘777 Patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). Mimaki makes and sells the LX101 series inks to customers, such as commercial print shops, for example, usable to print on PVC film, banner materials, and other media comprising non-absorbing substrates. Upon information and belief, Mimaki’s customers use at least the LX101 series inks in production printers, such as the JV400 Series printers, for example, to print on media comprising a non-absorbing substrate. Mimaki

markets the JV400 Series printers as being configured for use with the LX101 series inks to print signs, banners, and the like, on media comprising any of several non-absorbing substrates. Upon information and belief, Mimaki provides information to its customers in the form of brochures, manuals, online content, and via live demonstrations at industry conferences and exhibitions instructing them to use the LX101 series ink products with media comprising a non-absorbing substrate in a manner which directly infringes at least claim 1 of the ‘777 Patent.

64. Mimaki contributes to the infringement of one or more of the claims of the ‘777 patent by its customers and end users of at least the accused products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). Mimaki makes and sells at least the LX101 series inks which comprise aqueous ink jet inks and are marketed as being usable to print on PVC film, banner materials, and other media comprising non-absorbing substrates. As such, the LX101 series inks of Mimaki comprise a material component of the combination claimed in the ‘777 Patent. The LX101 series inks are especially suited for use with media comprising a non-absorbing substrate as claimed in at least claim 1 of the ‘777 Patent. Use by Mimaki’s customers of the LX101 series inks as advertised by Mimaki constitutes direct infringement of at least claim 1 of the ‘777 Patent. Upon information and belief, the LX101 series inks have no substantial non-infringing use.

65. CCI expressly reserves the right to assert additional claims of the ‘777 Patent against Mimaki.

66. CCI has been damaged as a result of Mimaki’s infringing conduct. Mimaki is, thus, liable to CCI in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Based on Mimaki’s objective recklessness, CCI is further entitled to enhanced damages under 35 U.S.C. § 284.

## VI. PATENT INFRINGEMENT

### U.S. Patent No. 6,197,466 B2

67. CCI repeats and realleges all preceding paragraphs of this Complaint, as though fully set forth herein.

68. On March 6, 2001, United States Patent No. 6,197,466 B2 ("the '466 Patent") was duly and legally issued for an "Electrophotographic Toner Surface Treated with metal Oxide." The '466 Patent remains in force as of the filing of this Complaint. A true and correct copy of the '466 Patent is attached hereto as Exhibit "C" and made a part hereof.

69. CCI is the owner of all right and title in the '466 Patent, including all rights to enforce and prosecute action for infringement of the '466 Patent and to collect damages for all relevant times against infringers of the '466 Patent. Accordingly, CCI possesses the exclusive right and standing to prosecute the present action for infringement of the '466 Patent by Defendants.

70. The '466 Patent generally discloses and claims toners comprising particles treated with metal oxides. Metal oxides, such as titanium dioxide, silicon dioxide, or a combination thereof, are mixed with the toner particles in a manner causing embedment of metal oxide particles below the surface of toner particles. The resulting toner composition may exhibit more stable triboelectric charging and may, therefore, improve image quality in electrophotographic printing operations.

71. For at least the reasons stated above, in reference to the '102 Patent of CCI, REI and RUSA, respectively, likely had prior knowledge of, or was willfully blind to, the existence of the '466 Patent since well before the filing of this Complaint.

72. Additionally, or alternatively, REI and RUSA have actual knowledge of the existence of the '466 Patent since at least March 10, 2017, the date which REI and RUSA each received copies of the '466 Patent attached to correspondence from CCI alleging infringement of one or more claims of the '466 Patent consistent with the allegations made herein.

73. REI, without authority, consent, right, or license, and in direct infringement of the '466 Patent, manufacture, have manufactured, make, have made, use, import, or have imported systems or products that directly infringe one or more claims of the '466 Patent. By way of example only, REI's manufacture of the PxP-EQ toner infringes at least Claim 9 of the '466 Patent. Additionally, upon information and belief, REI's manufacture of Savin brand LP Toner Cassettes infringes at least Claim 9 of the '466 Patent

74. RUSA, without authority, consent, right, or license, and in direct infringement of the ’466 Patent import, have imported, market, sell, or offer for sale systems or products that directly infringe one or more claims of the ’466 Patent. By way of example only, RUSA’s sale of the PxP-EQ toner infringes at least Claim 9 of the ’466 Patent. Additionally, upon information and belief, RUSA’s selling of Savin brand LP Toner Cassettes infringes at least Claim 9 of the ’466 Patent

75. Upon information and belief, the PxP-EQ comprises toner particles mixed with the metal oxides titanium dioxide and silicon dioxide, with at least a portion of the metal oxide particles embedded below the surface of the toner particles. The total metal oxide content of the PxP-EQ toner is believed to be between 0.1 – 5.0% by weight. The PxP-EQ toner is compatible with many printers manufactured by RFG entities.

76. Upon information and belief, the LP Toners comprise toner particles mixed with the metal oxides titanium dioxide and silicon dioxide, with at least a portion of the metal oxide particles embedded below the surface of the toner particles. The total metal oxide content of the LP Toners is believed to be between 0.1 – 5.0% by weight. The LP Toners are compatible with many printers manufactured by RFG entities.

77. CCI expressly reserves the right to assert additional claims of the ’466 Patent against REI and RUSA, respectively.

78. CCI has been damaged as a result of the infringing conduct of REI and RUSA. REI and RUSA are, thus, liable to CCI in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

79. Based on REI’s and RUSA’s respective objective recklessness, CCI is further entitled to enhanced damages under 35 U.S.C. § 284.

80. For at least the reasons stated above, in reference to the ‘102 Patent of CCI, Lanier likely had prior knowledge of, or was willfully blind to, the existence of the ‘466 Patent since well before the filing of this Complaint.

81. Additionally, or alternatively, Lanier has actual knowledge of the existence of the '466 Patent since at least March 10, 2017, the date which Lanier received a copy of the '466 Patent attached to correspondence from CCI alleging infringement of one or more claims of the '466 Patent consistent with the allegations made herein.

82. Lanier, without authority, consent, right, or license, and in direct infringement of the '466 Patent, manufacture, have manufactured, make, have made, use, import, have imported, market, sell, or offer for sale systems or products that directly infringe one or more claims of the '466 Patent. By way of example only, Lanier's manufacture and sale of the 4800038 Black Toner infringes at least Claim 9 of the '466 Patent. Upon information and belief, the 4800038 Black Toner comprises toner particles mixed with the metal oxides titanium dioxide and silicon dioxide, with at least a portion of the metal oxide particles embedded below the surface of the toner particles. The total metal oxide content of the 4800038 Black Toner is believed to be between 0.1 – 5.0% by weight. Upon information and belief, the 4800038 Black Toner is compatible with many printers manufactured by RFG entities.

83. CCI expressly reserves the right to assert additional claims of the '466 Patent against Lanier.

84. CCI has been damaged as a result of Lanier's infringing conduct. Lanier is, thus, liable to CCI in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

85. Based on Lanier's objective recklessness, CCI is further entitled to enhanced damages under 35 U.S.C. § 284.

## VI. PATENT INFRINGEMENT

### U.S. Patent No. 6,453,127 B2

86. CCI repeats and realleges all preceding paragraphs of this Complaint, as though fully set forth herein.

87. On September 17, 2002, United States Patent No. 6,453,127 B2 ("the '127 Patent") was duly and legally issued for an "Establishment at a Remote Location of an

Internet/Intranet User Interface to a Copier/Printer." The '127 remains in force as of the filing of this Complaint. A true and correct copy of the '127 Patent is attached hereto as Exhibit "D" and made a part hereof.

88. CCI is the owner of all right and title in the '127 Patent, including all rights to enforce and prosecute action for infringement of the '127 Patent and to collect damages for all relevant times against infringers of the '127 Patent. Accordingly, CCI possesses the exclusive right and standing to prosecute the present action for infringement of the '127 Patent by Defendants.

89. The '127 Patent generally discloses and claims printing apparatuses configurable to operate in response to instructions provided by remote users. Remote users interface with the printing apparatus using remote computers to configure and command its marking engine via a network web server and downloadable software. An applet provides a printer interface display screen on a remote computer viewable by the remote users of the printing apparatus.

90. REI and RUSA, respectively, had knowledge of the existence of the '127 Patent since at least March 23, 2011 when Ricoh Co., Ltd., caused to be filed with the U.S. Patent and Trademark Office an Information Disclosure Statement citing the '127 Patent during the prosecution of U.S. Patent Application 11/846,884. In total, Ricoh Co., Ltd. the '127 Patent was cited during prosecution of eight Ricoh Co., Ltd. patents.

91. Additionally, or alternatively, REI and RUSA have actual knowledge of the existence of the '127 Patent since at least March 10, 2017, the date which REI and RUSA, respectively, received copies of the '127 Patent attached to correspondence from CCI alleging infringement of one or more claims of the '127 Patent consistent with the allegations made herein.

92. REI, without authority, consent, right, or license, and in direct infringement of the '127 Patent, manufacture, have manufactured, make, have made, use, import, have imported systems or products that directly infringe one or more claims of the '127 Patent. By way of example only, REI's manufacture of the MP W7100 and W8140 series printer/copier/scanner devices infringes at least 1 of the '127 Patent. In addition, REI's manufacture of the MP7100

series printer/copier/scanner devices marketed and sold under the Savin brand name infringes at least 1 of the ‘127 Patent.

93. RUSA, without authority, consent, right, or license, and in direct infringement of the ‘127 Patent market, sell, or offer for sale systems or products that directly infringe one or more claims of the ‘127 Patent. By way of example only, RUSA’s selling of the MP W7100 and W8140 series printer/copier/scanner devices infringes at least Claim 1 of the ‘127 Patent. In addition, RUSA’s selling of the MP7100 series printer/copier/scanner devices under the Savin brand name infringes at least 1 of the ‘127 Patent.

94. The MP W7100/W8140 and MP7100 devices are implemented with a Web Image Monitor accommodating access by remote users to provide configuration and operating instructions to the devices via a web browser. Upon information and belief, use of the Web Image Monitor allows remote users to interface with the marking engine of the accused devices via downloadable software to view one or more statuses of the accused device as well as to configure and command operation of the accused devices.

95. REI, without authority, consent, right, or license, and in direct infringement of the ‘127 Patent, manufacture, have manufactured, make, have made, use, import, have imported the following devices which comprise similar features and functions to those of the W7100 and W8140 series devices and, therefore, similarly infringe the ‘127 Patent: the MP 3554 series devices; the SP C250DN series devices; the MP301SPF series devices; the MP C6503 series devices; the MP C8003 series devices; the MP C3004/3504/4504/6004 series devices; the MP C2004/2504 series devices; the MP C306 and C401 series devices; the MP 4054SP/5054SP/6054SP series devices; the SP 3600DN/3600SF/3610SF series devices; the MP 2501 series devices; the SG 3100 series devices; and, the SP 3510SF series devices.

96. RUSA, without authority, consent, right, or license, and in direct infringement of the ‘127 Patent market, sell, or offer for sale the following devices which comprise similar features and functions to those of the W7100 and W8140 series devices and, therefore, similarly infringe the ‘127 Patent: the MP 3554 series devices; the SP C250DN series devices; the MP301SPF series devices; the MP C6503 series devices; the MP C8003 series devices; the MP

C3004/3504/4504/6004 series devices; the MP C2004/2504 series devices; the MP C306 and C401 series devices; the MP 4054SP/5054SP/6054SP series devices; the SP 3600DN/3600SF/3610SF series devices; the MP 2501 series devices; the SG 3100 series devices; and, the SP 3510SF series devices.

97. CCI expressly reserves the right to assert additional claims of the '127 Patent against REI and RUSA, respectively.

98. CCI has been damaged as a result of REI's and RUSA's infringing conduct. REI and RUSA are, thus, liable to CCI in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

99. Based on REI's and RUSA's respective objective recklessness, CCI is further entitled to enhanced damages under 35 U.S.C. § 284.

100. Lanier had knowledge of the existence of the '127 Patent since at least March 23, 2011 when Ricoh Co., Ltd., the parent entity owning Lanier caused to be filed with the U.S. Patent and Trademark Office an Information Disclosure Statement citing the '127 Patent during the prosecution of U.S. Patent Application 11/846,884. In total, Ricoh Co., Ltd. the '127 Patent was cited during prosecution of eight Ricoh Co., Ltd. patents. Further, upon information and belief, Lanier acquired knowledge of the '127 Patent through benchmarking activities undertaken by Lanier investigating competitor's products, such as those of KODAK.

101. Additionally, or alternatively, Lanier has actual knowledge of the existence of the '127 Patent since at least March 10, 2017, the date which Lanier received a copy of the '127 Patent attached to correspondence from CCI alleging infringement of one or more claims of the '127 Patent consistent with the allegations made herein.

102. Lanier, without authority, consent, right, or license, and in direct infringement of the '127 Patent, manufacture, have manufactured, make, have made, use, import, have imported, market, sell, or offer for sale systems or products that directly infringe one or more claims of the '127 Patent. By way of example only, Lanier's manufacture of the MP 402SPF, the SP 5300DN, the MP 501SPF, and the MP 601SPF series devices infringes at least Claim 1 of the '127 Patent.

Upon information and belief, these Lanier products comprise similar features and functions as those of the W7100 and W8140 series devices of Ricoh and, therefore, similarly infringe the '127 Patent. Namely, the accused Lanier products, are implemented with a Web Image Monitor accommodating remote user configuration and operation of the accused Lanier products.

103. CCI expressly reserves the right to assert additional claims of the '127 Patent against Lanier.

104. CCI has been damaged as a result of Lanier's infringing conduct. Lanier is, thus, liable to CCI in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Based on Lanier's objective recklessness, CCI is further entitled to enhanced damages under 35 U.S.C. § 284.

## IV. JURY DEMAND

105. Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendants, and that the Court grant Plaintiff the following relief:

a. Judgment that one or more claims of the Asserted Patents have been directly infringed, either literally or under the doctrine of equivalents, by Defendants, or judgment that one or more of the claims of the Asserted Patents have been directly infringed by others and indirectly infringed by Defendants, to the extent Defendants contributed to or induced such direct infringement by others;

b. Judgment that Defendants account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendants' infringing activities and other conduct complained of herein, including enhanced damages as permitted by 35 U.S.C. § 284;

c. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendants' infringing activities and other conduct complained of herein;

d. That the Court declare this an exceptional case and award Plaintiff its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

e. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

DATED: March 13, 2017

/s/ H.H. (Shashi) Kewalramani

H.H. (SHASHI) KEWALRAMANI
S|H|K Legal, APC
2603 Main Street, Suite 350
Irvine, CA 92614
Telephone: (714) 335-4590
Fax: (714) 602-9290
Email: shashi@shklegal.com

Attorney for Plaintiff
COMMERCIAL COPY INNOVATIONS, INC.

Of Counsel:

Jonathan T. Suder
Brett M. Pinkus
Richard A. Wojcio, Jr.
FRIEDMAN, SUDER & COOKE
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
Telephone: (817) 334-0400
Facsimile: (817) 334-0401
Email: jts@fsclaw.com
Email: pinkus@fsclaw.com
Email: wojcio@fsclaw.com